## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| YVONNE THOMAS and BRIDGETTE THOMAS, on behalf of plaintiffs and the classes described herein, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| TRANSWORLD SYSTEMS INC., as successor to NCO FINANCIAL SYSTEMS INC., NCO FINANCIAL SYSTEMS INC., now known as EGS FINANCIAL CARE, INC.; and BLITT AND GAINES, P.C., | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.      Plaintiffs Yvonne Thomas and Bridgette Thomas seek redress from unlawful practices engaged in by Transworld Systems Inc. as successor to NCO Financial Systems Inc. ("Transworld"), NCO Financial Systems Inc., now known as EGS Financial Care, Inc. ("NCO"), and Blitt and Gaines, P.C. ("Blitt"), in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction exists under 15 U.S.C. §1692k, and 28 U.S.C. §§1331 and 1337.

3.      Because defendants' collection activities occurred in this District, and because they do business here, personal jurisdiction and venue in this District is proper.

1

## PARTIES

4. Plaintiffs Yvonne Thomas and Bridgette Thomas live in Cook County, Illinois.

5. Transworld is a corporation chartered under California law with offices at 507 Prudential Road, Horsham, Pennsylvania 19044. It does business in Illinois. Its registered agent is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

6. Transworld is a collection agency. It seeks to collect on defaulted consumer debts that were originally owed to others, using the mail, telephone and electronic wire services to do so, all in the general course of trade and commerce.

7. NCO is a Pennsylvania corporation with offices at 507 Prudential Road, Horsham, Pennsylvania 19044. It does, or did, business in Illinois. Its registered agent is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

8. NCO is a collection agency that does business in Illinois, and is licensed as such by the State of Illinois. It seeks to collect on defaulted consumer debts that were originally owed to others, using the mail, telephone and electronic wire services to do so, all in the general course of trade and commerce.

9. Transworld is the successor to NCO.

10. Transworld manages "Agency and Attorney Networks," which are described on its website (http://www.tsico.com/Services/Agency_Attorney_Network.html) as follows:

> Transworld Systems Inc. is expanding its existing Agency and Attorney Networks with current and new business opportunities. We are extremely proud of our Agency and Attorney Networks which designs and implements cost-effective collection solutions on behalf of clients across the country. We manage a nationwide network through leading-edge technology and the expertise needed to achieve results.
>
> We strive to surpass the growing and complex needs of our clients through the professional services provided by our Agency and Attorney Networks. TSI is currently seeking collection

agencies and law firms to support our growing network and expanded business opportunities. TSI has a variety of business opportunities in which we are seeking professional, cost-conscious industry experts to join our Agency and Attorney Networks. The business opportunities contain, although not limited to, the following: healthcare, commercial, student loans, telecommunications, and bank card.

11. Transworld's Agency and Attorney Networks are continuations of virtually identical networks set up by NCO. For example, the Form 10-K annual report filed by NCO's parent company for 2010 said that NCO employees "coordinate and implement legal collection solutions undertaken on behalf of our clients through the management of nationwide legal resources specializing in collection litigation. Our collection support staff manages the attorney relationships and facilitates the transfer of necessary documentation."

12. Blitt is a law firm organized as an Illinois corporation located at 661 Glenn Avenue, Wheeling, Illinois 60090.

13. Blitt is engaged in the business of using the mails and telephone to collect consumer debts originally owed to others.

14. Each defendant is a "debt collector," as defined in 15 U.S.C. §1692a.

**FACTS**

15. Defendants have been seeking to collect from plaintiffs alleged student loan debts, incurred for personal, family or household purposes.

16. On or about October 1, 2014, Blitt, as attorney, filed suit against plaintiffs Yvonne Thomas and Bridgette Thomas, in the Cook County, Illinois, Fourth Municipal Court, on behalf of "National Collegiate Student Loan Trust 2006-3," case 2014-M4-001882. A copy of the collection complaint and related documents is attached as Appendix A.

17. The complaint alleged that Yvonne Thomas and Bridgette Thomas had executed a

3

"note" in September 2006.

18. Attached to the collection complaint was an affidavit executed by a representative of NCO, swearing that Yvonne Thomas and Bridgette Thomas had executed a "note."

19. NCO, and now Transworld, serviced the loan on behalf of the "National Collegiate Student Loan Trust 2006-3," and hired and directed Blitt to file the collection action.

20. The complete "note" was not attached to the collection complaint.

21. The full document was not a note. It was not a contract wholly in writing within the meaning of the Illinois 10-year statute of limitations, 735 ILCS 5/13-206, but a "Loan Request/ Credit Agreement".

22. The "Loan Request/ Credit Agreement" does not promise to loan a specified amount of money on specified terms.

23. On information and belief, it states on the second page, not attached to the collection complaint, that submission of the request does not create a contract and that the actual loan amount if any may differ from that requested. The actual amount of the loan in this case, and the consumer's acceptance of the terms actually offered, depends on a later course of dealing.

24. The following is an example of the terms of "Loan Request/Credit Agreement":

A. PROMISE TO PAY: I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum, and other charges set forth herein.

B. LOAN; DISCLOSURE STATEMENT:

1. By signing this Credit Agreement, and submitting it to you, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. When you receive my

signed Application, you are not agreeing to lend me money. You have the right not to make a loan or lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me along with interest and all other amounts I owe (see Paragraph A). You have the right to disburse my loan through an agent.

2. If you agree to make a loan to me, you will mail me the disbursement check (the "Disbursement Check") and a statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the "Disclosure Statement"). You have the right to disburse my Disbursement Check through an agent. At your option, you may also make any Disbursement Check or co-payable to me and the Cosigner or to me and the School. In addition to other information, *the Disclosure Statement will tell me the amount of my disbursement and the amount of the Loan Origination Fee.* The Disclosure Statement is part of this Credit Agreement. *Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be used by or on behalf of the Borrower without objection will acknowledge receipt of the Disclosure Statement and my agreement to be legally bound by this Credit Agreement.*

3. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice, together with my unused Disbursement Check or, if I have already endorsed and delivered the Disbursement Check to the School, a good check, payable to you in the full amount of the Disbursement Check. In any event, I cannot cancel more than ten (10) days after I receive the Disclosure Statement. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.3, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.) (Emphasis added)

25. The terms on which the loan is to be repaid are also not determinable from the "Loan Request/ Credit Agreement." Pages 2-3 of the document, which were not attached to the collection complaint, state that the payment schedule "will be established" or "will be recalculated" or "will be disclosed" in the future.

E. TERMS OF REPAYMENT:

1. Deferment Period- You may, or, if required by applicable law, will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). Statements will be sent to the Borrower at the address shown on your records. I may, but am not required to, make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance at the end of the Deferment Period, as described in Paragraph D.3.

Thereafter, the accrued interest will be treated as principal.

2. Repayment Period- The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.

3. Repayment Terms- My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period- Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe principal, interest, and/or late fees at the end of the Repayment Period. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full in a single payment.

5. Payments- Payments will be applied first to the late fees and other fees and charges, then accrued interest, and the remainder to principal. If I have multiple loans, processed by the servicer, and I submit a single payment that is not sufficient to pay all of the amounts I owe, such payment may be divided between or among the loans in accordance with applicable law

> and the servicer's customary procedures.
>
> 6. Other Charges- If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. I will pay only one late fee for any (monthly) payment, regardless of the number of days it is late. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

26. The resulting contract is not a note and is not a contract wholly in writing and not subject to the 10-year statute of limitations. *Portfolio Acquisitions, LLC v. Feltman*, 391 Ill. App. 3d 642, 647, 909 N.E.2d 876 (1st Dist. 2009).

27. In addition, there are substantial questions concerning the enforceability of such a contract against a cosigner under the Statute of Frauds. A signed note satisfies the Statute of Frauds; a document stating that it is not a contract does not.

28. Finally, there are often issues concerning whether the National Collegiate Trusts are actual owners of the debts. Ownership of a note is transferred in a different manner than ownership of a nonnegotiable chose in action.

29. The misrepresentation as to the nature of the transaction thus is likely to mislead unsophisticated consumers as to their rights, and imposes unnecessary expense on even those few consumers who are represented.

30. Transworld and its predecessor, NCO (hereafter, "Transworld / NCO") have engaged in deceptive and unfair conduct, or permitted such conduct to be used by other agencies working on its behalf, in connection with the collection of debts, as shown by the following:

   a. One of the NCO employees who signed affidavits for National Collegiate cases, Chandra Alphabet, signed an agreement with the Georgia Bar to cease

    and desist from engaging in the unauthorized practice of law in March 2013.

b.  On July 9, 2013, NCO and related entities entered into a consent judgment in *United States v. Expert Global Solutions, Inc., formerly known as NCO Group, Inc., NCO Financial Systems, Inc., ALW Sourcing, LLC, Transworld Systems Inc.*, 3:13CV2611 (N.D.Tex.), agreeing to injunctive relief and to pay $3.2 million in penalties for improper debt collection practices involving harassment and abuse.

c.  In February 2012, the Attorneys General of 19 states (Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin) entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, under which NCO agreed to pay $575,000 to the 19 states for consumer protection enforcement efforts and an additional $50,000 for each participating state to refund consumers with valid claims.

d.  Between 2010 and 2012, NCO signed a series of consent orders with the Minnesota Department of Commerce, involving such conduct as hiring unfit persons.

e.  In November 2010, NCO signed a consent order with the Arizona Department of Financial Institutions involving, among other things, unauthorized practice of law.

f.  In January 2006, NCO entered into a settlement with the Pennsylvania

        Attorney General to resolve numerous claims of using false, deceptive, or misleading representations or means and harassment in connection with the collection of debts.

    g.    In 2004, NCO Group Inc. settled Federal Trade Commission charges that it reported inaccurate information about debtors accounts to credit reporting agencies and paid $1.5 million in civil penalties.

31.    On information and belief, based on affidavits and evidence in *Williams v. NCO Group Inc.*, No. 5:10CV761 (C.D.Cal.), *NCO Financial Systems Inc. v. Daniels Law Offices PC*, No. 1:11CV11035 (D.Mass) and other cases, NCO selects counsel, communicates with counsel, and instructs counsel. The nominal plaintiff in each case (in this case, "National Collegiate Trust 2006 - 4") does not select, communicate with or instruct counsel.

32.    As a matter of its standard operating procedure ("SOP"), Transworld / NCO directs network law firms to not communicate with the nominal plaintiffs:

> NCO will interact directly with the Client. In some instances, attorneys may interact directly with the Client only after a request is made through NCO and the Client approves. Only in urgent situations, the firm, and a Client may make contact providing that NCO has also been informed of the situation. If a Client initiates contact with an Attorney Firm directly, the firm is responsible, for the purposes of inventory control and tracking, to notify NCO of the communication.
>
> ln essence, the Attorney Firm's first point of contact is NCO. All statements, notices, information, etc. will go through NCO. (Attorney Firm SOP v.2.1)

33.    Another portion of the Transworld / NCO SOP states that "all communications regarding accounts will be conducted between the Attorney Firm and NCO only." On information and belief, subsequent versions of the SOP were consistent.

34.    Law firms hired by Transworld / NCO are expressly informed that they are "required

to follow NCO's Network Attorney Standard Operating Procedures."

35. Both Transworld / NCO, and firms in its network, are paid on commission.

36. Transworld / NCO grades network firms in Attorney Report Cards based on "key performance indices" geared to the speed with which judgments are obtained and collected. The indices include such metrics as"Payer Rates," "Suit Rate," "Service Rates," "Judgment Rates" and "Spin" or "Liquidation Rates."

## COUNT I – FDCPA

37. Plaintiffs incorporate paragraphs 1-36.

38. Defendants violated 15 U.S.C. §1692e, 1692e(2), and 1692e(10) by misrepresenting that the debt consisted of a "note" when this was not true.

39. Section 1692e provides:

> **a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**
>
> **(2) The false representation of –**
>
> **(A) the character, amount, or legal status of any debt...**
>
> **(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

40. This violation did not only occur with respect to plaintiff, but with respect to all other consumers who were sued on a "note" by defendants. There are at least hundreds of people in this situation.

## CLASS ALLEGATIONS

41. Under Fed.R.Civ.P. 23(a) and (b)(3), plaintiffs seek relief for a class.

42. The class includes (a) all individuals in Illinois, (b) who were sued by "National Collegiate" entity represented by Blitt, (c) on a document described in the complaint as a "note", (d) but which isn't attached in full to the complaint, where (e) the suit was filed or served at any time beginning one year prior to the filing of this action and ending 20 days after the filing of this action.

43. On information and belief, based on the use of a form complaint, the class is so numerous that joinder of all members is not practicable.

44. There are questions of law and fact common to the members of the class, which predominate over any questions relating to individual class members. The predominant common question is whether the representation discussed herein violates the FDCPA.

45. Plaintiffs' claim is typical of the claims of the members of the class, as it is based on the same facts and legal theories.

46. Plaintiffs will fairly and adequately represent the class members, and has retained counsel experienced in class actions and FDCPA litigation.

47. A class action is superior for the fair and efficient adjudication of this matter, in that (A) individual actions are not economically feasible, (B) members of the class are likely to be unaware of their rights, and (C) Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, judgment in favor of plaintiff and the class should be given, awarding

    (A)    statutory damages,

    (B)    attorney's fees, litigation expenses and costs of suit, and

    (C)    all other proper relief.

/s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Emiliya Gumin Farbstein
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **NOTICE OF LIEN AND ASSIGNMENT**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

<u>/s/ Daniel A. Edelman</u>
Daniel A. Edelman

## **DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that each defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with any plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiffs demand that defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendants.

                                                                  s/Daniel A. Edelman
                                                                  Daniel A. Edelman